Cheryl J. Scarboro
Reid A. Muoio (RM 2274)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6030
(tel) 202/551-4403 (Scarboro)

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
                                        )
SECURITIES AND EXCHANGE COMMISSION,     )
                                        )
                Plaintiff,              )      JUDGE MARRERO
        v.                              )
                                        )      **COMPLAINT**
R&G FINANCIAL CORPORATION,              )
                                        )      08 CV 1471
                Defendant.              )
                                        )
- - - - - - - - - - - - - - - - - - - - x

        Plaintiff Securities and Exchange Commission (the
"SEC") alleges as follows:

                    **NATURE OF THE ACTION**

        1.    The SEC brings this financial fraud action against
R&G Financial Corporation, a bank holding company with
mortgage banking operations in the Commonwealth of Puerto
Rico.    R&G Financial inflated net income by approximately
$180 million or 80% on a cumulative basis by improperly
accounting for billions of dollars worth of mortgage-related
transactions in 2002, 2003 and 2004.    Those accounting
irregularities enabled R&G Financial to report an apparent
twelve quarter streak of "record earnings."    Since the
accounting and disclosure irregularities began to surface in

early 2005, the market price of the company's common stock plummeted from approximately $40 to $10 per share or 75%, thereby reducing equity market value by approximately $900 million.

2.    By engaging in such conduct, R&G Financial violated Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13], promulgated thereunder.

3.    Since then R&G Financial's board of directors made significant management changes, restated the company's financials and took other significant remedial action.  The latter includes entering into consent orders with the Board of Governors of the Federal Reserve and the Federal Deposit Insurance Corporation.

## JURISDICTION

4.    This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].  R&G Financial has, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails in connection with the transactions described in this Complaint.

## DEFENDANT

5.    R&G Financial Corporation ("R&G Financial" or the "company") is a bank holding company with mortgage banking operations in Puerto Rico.

6.    R&G Financial was the second largest mortgage loan originator for single-family residences in Puerto Rico during the relevant period.    The volume of residential mortgages loans originated by R&G Financial during 2004, 2003 and 2002 was $2.3 billion, $2.8 billion and $2.0 billion, respectively.

7.    R&G Financial's Class B common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act during the relevant period and was listed on the NYSE from July 2002 until February 2007.    The company's Class B common stock now trades on the pink sheets at around $1 per share.    There were approximately 30 million shares of Class B common stock outstanding during the relevant period.

8.    R&G Financial's longtime independent auditor is PricewaterhouseCoopers LLP ("PwC").

## SUBSTANTIVE ALLEGATIONS

## R&G FINANCIAL'S MORTGAGE LOAN SALE TRANSACTIONS

9.    R&G Financial was engaged in the business of originating first and second mortgage loans on single-family residential properties secured by real estate.    The majority

3

of these mortgages were "nonconforming," meaning, they did not satisfy loan origination guidelines of the Federal Home Loan Mortgage Corporation ("Freddie Mac") and Federal National Mortgage Association ("Fannie Mae").

10. R&G Financial purported to sell pools of nonconforming loans in privately negotiated transactions, principally to other Puerto Rican financial institutions. R&G Financial generally agreed to pay the contra-party a specified pass-through interest rate for the entire pool of loans. Any amounts received on the mortgages above the pass-through rates were retained by R&G Financial. The pass-through rate paid to the contra-party was generally a variable rate based upon a spread over the three-month London Interbank Offered Rate ("Libor").

11. The purported present value of the future cash flow retained by R&G Financial was recognized on the company's financial statements as interest-only strips ("IOs"). The fair values assigned to the IOs were recognized as gain on sale by R&G Financial. For 2004, 2003 and 2002, R&G Financial recognized $144.6 million, $96.3 million and $43.5 million, respectively, of gain on sale from the mortgage-related transactions. Most of those gains were associated with the IOs.

**R&G FINANCIAL'S IMPROPER GAINS ON SALE**

12.  R&G Financial accounted for mortgage-related transactions as sales.  The provisions in the written agreements obligated R&G Financial to guarantee timely payment of principal and interest for the life of the mortgages.  These full recourse provisions were incompatible with a "true sale" accounting treatment and thus no gain should have been recognized under Statement of Financial Accounting Standards No. 140 ("SFAS 140"), "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities."

13.  As a result, R&G Financial improperly recognized gain on sale from these mortgage-related transactions and should have instead accounted for them as secured borrowings.  As alleged below, R&G Financial senior management knew, or was reckless in not knowing, that the company was improperly accounting for mortgage-related transactions as sales.

14.  During the 2003 audit, R&G Financial's former CFO sought to obtain a legal opinion from outside counsel to support true sale accounting treatment of certain mortgage-related transactions under SFAS 140.  After legal research and analysis, this first outside legal counsel informed the former CFO that he could not provide the requested opinion because he did not believe that the transactions qualified as true sales at law.  This attorney also told the former

CFO that he believed there would be a significant adverse impact on the company's financial statements should the transactions be re-characterized as secured borrowings.

15. Outside counsel subsequently informed R&G Financial's former CEO in a brief conversation that he had been asked to provide a true sale opinion but could not and that he was concerned that the company had a problem. This outside legal counsel's concerns were never addressed because the former CFO was able to obtain true sale opinions from a second outside law firm after the filing of the company's 2004 Form 10-K under circumstances alleged below.

16. After the filing of the 2003 Form 10-K, R&G Financial retained a second outside law firm to provide opinions supporting true sale treatment of the mortgage-related transactions. The second outside law firm provided certain true sale opinions to the company prior to the satisfaction of certain conditions it had determined were necessary – and advised the former CFO were required – in connection with the delivery of those opinions, e.g., execution of amendments to various transaction documents. A lawyer at the second law firm did this as an accommodation to the company. R&G Financial provided PwC copies of these opinions in connection with the 2004 audit.

17. On October 21, 2005, one of R&G Financial's contra-parties, First BanCorp, announced that it might have to restate previously issued financial statements because

certain mortgage-related transactions did not qualify as true sales. On October 25, 2005, R&G Financial's main competitor announced publicly that it too was investigating true sale accounting issues. R&G Financial's stock price was negatively affected by these disclosures, dropping approximately $2 per share from $11.50 to $9.45 that week. R&G Financial's stock price was largely unaffected when it announced on November 4, 2005 its own investigation of true sale accounting issues.

**R&G FINANCIAL OVERVALUED ITS IOs**

18. R&G Financial should have recognized no gain on sale and instead accounted for these transactions as secured borrowings; however, even if gain recognition was not an error, the company knowingly overstated gains and the value of its IOs. This occurred because, without disclosing to the investing public, R&G Financial used the so-called "spot rate" methodology without a reasonable basis to compute the value of its IOs and gain on sale.

19. The spot rate was the 90-day Libor rate at the end of each rating period. R&G Financial assumed for accounting purposes that interest rates remained fixed for the life of the underlying mortgages at the spot rate. This assumption was inconsistent with a reasonable determination of fair value. The fair value of a security of this nature would have assumed an expected interest rate spread based on implied forward Libor rates ("forward curve").

Incorporating the forward curve into R&G Financial's valuation methodology would have reduced the value of its IOs and gains recognized on the purported sales of the underlying mortgages.

20. R&G Financial senior management knew, or was reckless in not knowing, that use of the spot rate to value the company's IOs was improper. R&G Financial's former Chief Financial Officer ("CFO") became aware in Summer of 2003 that an IO valuation based on the spot rate produced a value almost twice that as one based on the forward curve. In addition, as the result of communications with an external financial consulting firm, by late 2004 R&G Financial's former CFO had reason to believe that the use of the spot rate to value the IOs did not result in a reasonable fair value determination.

21. R&G Financial's stock price traded downwards from $35 in mid-March to $25 in mid-April 2005 as the market grew increasingly concerned over its valuation methodology. R&G Financial announced after the close of the market on April 25, 2005, that it was revising its valuation methodology and that doing so would reduce the value of its IOs by $90-to-$150 million. R&G Financial's stock price plummeted on this news falling $8.14 or 35% to close at $15.04 on April 26, 2005.

**R&G FINANCIAL'S SWAP TRANSACTIONS**

23.  R&G Financial managed earnings through a series of swap transactions with another Puerto Rican financial institution.  These involved generally contemporaneous purchases and sales of mortgage loans to and from the other financial institution where the amounts purchased and sold, and other terms of the transactions, were nearly identical.

24.  R&G Financial entered into approximately $200 million worth of these transactions during the fourth quarter of 2004 for which it improperly recognized gain on sale of $24 million.  R&G Financial's 2004 Form 10-K included a general description of the transaction and indicated that it was part of the company's risk management activities.  This disclosure was misleading since the company's principal purpose was to recognize gain on sale and book substantial income at year-end.

**R&G FINANCIAL'S RESTATEMENT**

25.  R&G Financial completed the restatement process in November 2007.  During the restatement process, the company retained new outside law firms to review the mortgage-related transactions.  These new law firms were unable to provide true sale opinions with respect to certain transactions in which the company provided the contra-party full recourse because these provisions were incompatible

with the requirements for sale accounting under SFAS 140. These transactions were re-characterized as secured borrowings.

26. R&G Financial re-characterized the swap transaction with Doral Financial because there was insufficient contemporaneous documentation of the company's purported business purpose.

27. According to R&G Financial's 2004 Form 10-K/A, net income was overstated by $184 million or 80% on a cumulative basis during the relevant period. Net income (in thousand) and diluted earnings per share (in dollars) for fiscal years 2002 through 2004 were restated as follows:

| | **Net** | **Income** | | **Diluted** | **EPS** | |
|---|---|---|---|---|---|---|
| | Original | Restated | Change | Original | Restated | Change |
| 2004 | $160,214 | $92,280 | (42%) | $2.81 | $1.49 | (47%) |
| 2003 | 131,024 | 89,818 | (31%) | 2.25 | 1.44 | (36%) |
| 2002 | 96,342 | 41,488 | (57%) | 1.66 | 0.54 | (67%) |

28. As a result of these accounting irregularities, the financial statements R&G Financial incorporated into its earnings releases and periodic filings were materially false and misleading from at least January 2002 through March 2005.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) and Rule 10b-5 of the Exchange Act)

29.  Plaintiff SEC hereby incorporates ¶¶ 1 through 28 with the same force and effect as if set out here.

30.  In the manner described in ¶¶ 1 through 29, defendant R&G Financial, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

## SECOND CLAIM FOR RELIEF

### (Violations of the Reporting Provisions of the Exchange Act)

31.  Plaintiff SEC hereby incorporates ¶¶ 1 through 30 with the same force and effect as if set out here.

11

32.   In the manner described in ¶¶ 1 through 31, defendant R&G Financial violated Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 promulgated there under [17 C.F.R. §§ 240.12b-20, 240.13a-1], by filing reports with the SEC that inaccurately reflected the company's financial performance and provided other untrue and inaccurate information to the public.

### THIRD CLAIM FOR RELIEF

### (Violations of the Books and Records and Internal Control Provisions of the Exchange Act)

33.   Plaintiff SEC hereby incorporates ¶¶ 1 through 32 with the same force and effect as if set out here.

34.   In the manner described in ¶¶ 1 through 33, defendant R&G Financial failed to make and keep accurate books and records and to devise and maintain an adequate system of internal accounting controls in violation of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

(i)   permanently enjoining defendant R&G Financial, and its officers, agents, servants, employees, attorneys, and those in active concert or participation with it who receive actual notice by personal service or otherwise, from

violating Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13], promulgated thereunder; and

(ii) granting such other relief as this Court may deem just and appropriate.

Dated: February 12, 2008

_Reid A. Muoio_

Cheryl J. Scarboro
Reid A. Muoio (RM 2274)

Attorneys for Plaintiff
Securities and Exchange
    Commission
100 F Street, N.E.
Washington, D.C. 20549-6030
(tel) 202/551-4403 (Scarboro)